IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

RENAISSANCE RECOVERY          *
SOLUTIONS, LLC, UNITED STATES *
FIRE INSURANCE COMPANY, and   *
INTERSTATE FIRE AND CASUALTY  *
COMPANY,                      *
                              *
        Plaintiffs,           *
                              *
             v.               *
                              *
MONROE GUARANTY INSURANCE     *
COMPANY and FCCI INSURANCE    *
COMPANY,                      *          CV 1:14-102
                              *
        Defendants.           *
                              *
                              *

------------------------

**O R D E R**

------------------------

When the Court last visited this case a little over a year
ago, it left unresolved several issues necessary to a final
decision. These issues included (1) whether Georgia or Michigan
law applied to the insurance policies in dispute, and (2) under
the applicable state law, which insurer(s) bear(s) the
responsibility for paying the nearly $2.5 million of disputed
insurance obligations. With the Court's permission, the parties
each filed summary judgment motions addressing these issues.
After reviewing the briefs, the Court finds that Georgia law
governs the insurance contracts in dispute and Plaintiffs and
Defendants each bear some responsibility for paying the disputed

coverage expenses. Thus, the Court **GRANTS IN PART** and **DENIES IN PART** the pending motions for summary judgment. (Docs. 70 & 76.)

## I. Background

In 2009, Michael Brown killed William Jacobs while attempting to repossess a truck owned by Jacob's business partner, Joseph Clements. The incident sparked two lawsuits in the Superior Court of Columbia County, Georgia: Clements and Jacobs. Each suit named the same four defendants: Nuvell National Auto Finance, LLC ("Nuvell") (the repossessing lender); Renaissance Recovery Solutions, LLC ("RRS") (the company Nuvell contracted with to conduct the repossession); Renovo Services, LLC ("Renovo") (the company RRS subcontracted with to perform the repossession); and Michael Brown (the repossession man Renovo contracted with to physically obtain the car). In Clements, Mrs. Clements, who witnessed the incident alongside her husband, brought suit individually and on behalf of her deceased husband. Clements settled for $450,000. In Jacobs, Mrs. Jacobs brought suit individually and on behalf of her deceased husband. All four defendants admitted to liability prior to trial, and a jury awarded damages of $2.5 million. The Superior Court entered judgment against all four defendants jointly and severally.

While the Jacobs case was proceeding, however, a dispute arose concerning insurance coverage. United States Fire Insurance Company ("U.S. Fire") and Interstate First and

Casualty Company ("Interstate") — Plaintiffs in this litigation — insured all four tortfeasors in the Jacobs and Clements cases: Brown, Nuvell, Renovo, and RRS. Monroe Guaranty Insurance Company ("Monroe") and FCCI Insurance Company ("FCCI") — Defendants in this litigation — insured only two of the tortfeasors in the Jacobs and Clements cases: RRS (directly) and Nuvell (through an indemnification agreement between Nuvell and RRS). Monroe and FCCI declined to provide coverage to RRS during the Jacobs litigation. In response, RRS filed a third-party complaint against Monroe in Jacobs claiming Monroe was contractually obligated to defend it and that Monroe's refusal to defend constituted bad faith.

A month prior to trial, the state trial court severed the third-party complaint from the Jacobs case. Once severed, the trial court entered summary judgment against RRS on the issues of coverage and bad faith. On appeal, the Georgia Court of Appeals reversed and held that Monroe had to provide coverage to RRS.

On remand, the trial court allowed RRS to add FCCI as an additional third-party defendant. It also allowed RRS to join U.S. Fire and Interstate as third-party plaintiffs. Monroe then removed the action to this Court invoking diversity jurisdiction.

At issue in this case is a dispute over which insurers are responsible for paying the costs of the judgment arising out of

the Jacobs litigation. Plaintiffs paid for both the defense of all four tortfeasors as well as the damages entered against them. Defendants refused to take any part in the litigation concerning their insured parties and claim they had no responsibility to pay for any portion of the damages.

Previously, this Court denied in part and granted in part various portions of two motions for summary judgment filed by Plaintiffs. (Doc. 65.) In that Order, the Court made several rulings: (1) the FCCI policy covered RRS (and thus Nuvell); (2) the state court verdict finding all tortfeasors jointly and severally liable could not be disturbed even if it was entered in contravention of Georgia's apportionment statute; (3) Plaintiffs were entitled to statutory interest under M.C.L. § 500.2006; and (4) Plaintiffs are not entitled to attorneys' fees under Georgia law. The Court also noted several unresolved questions: (1) What state's law governed the U.S. Fire and Interstate policies delivered to tortfeaser Renovo? (2) What state's law applies to resolve the issues of priority and allocation presented by the multiple policies and insureds? and (3) How does the applicable state law resolve the issues of priority and allocation?

In response to this Court's order, the parties filed dueling summary judgment motions. Having reviewed the parties' briefs, the Court now resolves the remaining disputes. The

central question before the Court being: Do Defendants owe any money to Plaintiffs, and, if so, how much?

## II. Standard of Review

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id.

5

at 323.  When the movant does not carry the burden of proof at trial, it may satisfy its initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  The movant cannot meet its initial burden by merely declaring that the non-moving party cannot meet its burden at trial.  Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id.  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  If the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  Id. at 1117.  The non-

movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave each opposing party notice of the motions for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Docs. 75, 77.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are now ripe for consideration.

### III. Discussion

The Court divides this opinion into two sections. In the first section, the Court addresses Defendants' argument that the Court must allocate the $2.5 million of damages among RRS, Nuvell, Renovo, and Brown as the insured tortfeasors before it allocates responsibility for payment among U.S. Fire, Monroe, Interstate, and FCCI as the insurers. In the second section, the Court explains which state's law governs the dispute between Plaintiffs and Defendants as insurers and determines who owes whom and in what amount.

## A.

The parties have arrived at an impasse on the fundamental character and goal of the present action. Plaintiffs view this action as only the allocation of a fixed amount of damages between co-insurers. Defendants, on the other hand, view this action as the allocation of damages among four tortfeasors (Nuvell, Brown, Renovo, and RRS) which will then determine the fixed amount of damages to be allocated between four co-insurers (Plaintiffs and Defendants).

Defendants aim to distinguish between the amount of money owed <u>by</u> their insured and the amount of money owed <u>to</u> their insured. Because Defendants insured only two of the tortfeasors in the underlying litigation, while Plaintiffs insured all four, Defendants argue that apportioning damages between the tortfeasors could drastically alter the amount of damages they are obligated to pay as insurers. Thus, before the Court allocates coverage expenses between Plaintiffs and Defendants as co-insurers of RRS and Nuvell, Defendants ask this Court to first determine the size of the coverage expenses incurred by RRS and Nuvell by apportioning damages between RRS, Nuvell, Renovo, and Brown. The Court declines Defendants' request.

The joint and several verdict issued by the state trial court in <u>Jacobs</u> requires this Court to assume that each tortfeasor is equally liable for the entire judgment assessed against them. See <u>Eidson v. Maddox</u>, 24 S.E.2d 895, 897-98 (Ga.

1943)(noting that once a joint and several verdict is entered, regardless of any differing degrees of negligence, the defendants are "equally liable to the plaintiffs and equally bound to discharge the several judgments"). All tortfeasors in this case have the ability, thanks to insurance, to satisfy the judgment against them. Thus, each tortfeasor should theoretically pay 25% of the $2.5 million judgment. Because the only tortfeasors insured by Defendants were Nuvell and RRS, Defendants would pay, at most, 50% of the judgment. But, if the Court were, after reviewing the evidence and holding an evidentiary hearing, to allocate liability between the tortfeasors such that each tortfeasor was liable for its share of fault in causing the accident, the result might look much different. For example, Brown, being the tortfeasor most closely related to the harm, might be assigned 85% of the fault, with the remaining 15% of the fault distributed equally among the three remaining torfeasors. Under this apportionment, Nuvell and RRS would be liable for only 10% of the total judgment. Therefore, their insurers, Defendants, would only be responsible for covering, at most, 10% of the judgment. The result: a sizeable savings by Defendants.

Georgia law, however, does not allow this Court to apportion liability between RRS, Nuvell, Renovo, and Brown. The Court is left then only to apportion coverage expenses between Monroe, U.S. Fire, Interstate, and FCCI as the insurers of RRS,

Nuvell, Renovo, and Brown.  The Court will now explain why that is so.

## 1.

When Defendants ask the Court to apportion damages between RRS, Nuvell, Renovo, and Brown, they are asking the Court to sustain a contribution action.  Contribution is "the right of one who has discharged a common liability or burden to recover of another also liable the aliquot portion which he ought to pay or bear."  Eidson, 24 S.E.2d at 897; see Arrow Exterminators, Inc. v. Zurich Am. Ins. Co., 136 F. Supp. 2d 1340, 1352 (N.D. Ga. 2001).  Contribution is a remedial action, thus it is governed by Georgia law.  Allstate Ins. Co. v. Duncan, 462 S.E.2d 638, 640 (Ga. Ct. App. 1995).  Under Georgia law, however, Defendants have no right to seek a contribution action between RRS, Nuvell, Renovo, and Brown.

Defendants have no right to seek contribution because the Georgia General Assembly largely, if not entirely, abolished such a right when it mandated that triers of fact apportion liability and damages among multiple tortfeasors at the trial stage of litigation.  In 2005, the Georgia General Assembly enacted comprehensive tort reform by passing Senate Bill 3. Thomas A. Eaton, Who Owes How Much? Developments in Apportionment and Joint and Several Liability Under O.C.G.A. § 51-12-33, 64 Mercer L. Rev. 15, 18 (2012).  A primary goal of S.B. 3 was eliminating joint and several liability.  Emily Ruth

Boness, The Effect (Or Noneffect) of the 2005 Amendments to O.C.G.A. Sections 51-12-31 and 51-12-33 on Joint Liability in Georgia, 44 Ga. L. Rev. 215, 229 (2009). To accomplish this goal, S.B. 3 revised § 51-12-33 of the Georgia Code. Id. Prior to S.B. 3, § 51-12-33 merely allowed juries to apportion fault and damages among multiple tortfeasors:

> Where an action is brought against more than one person for injury to person or property and the plaintiff is himself to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, may apportion its award of damages among the persons who are liable and whose degree of fault is greater than that of the injured party according to the degree of fault of each person. Damages, if apportioned by the trier of fact as provided in this Code section, shall be the liability of each person against whom they are awarded, shall not be a joint liablity among the persons liable, and shall not be subject to any right of contribution.

(emphasis added). After S.B. 3, however, § 51-12-33 required juries to apportion fault and damages among multiple tortfeasors:

> (a) Where an action is brought against one or more persons for injury to person or property and the plaintiff is to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall determine the percentage of fault of the plaintiff and the judge shall reduce the amount of damages otherwise awarded to the plaintiff in proportion to his or her percentage of fault.
>
> (b) Where an action is brought against more than one persons for injury to person or property, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the persons who are

11

liable according to the percentage of fault of each person. Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.

(c) In assessing percentages of fault, the trier of fact shall consider the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit.

(d)(1) Negligence or fault of a nonparty shall be considered if the plaintiff entered into a settlement agreement with the nonparty or if a defending party gives notice not later than 120 days prior to the date of trial that a nonparty was wholly or partially at fault.

In sum, the new § 51-12-33 created a mandatory apportionment scheme for damages caused by multiple tortfeasors, and, in doing so, it practically eliminated joint and several verdicts. The statute requires the jury to (1) identify all persons, including the plaintiff and persons not a party to the case, who are liable for any of the alleged damages, (2) determine the degree of each person's fault in causing those damages, and (3) allocate the damages among liable parties according to their respective degree of fault. By requiring the fact finder to apportion fault and damages at the time of trial whenever there is "one or more tortfeasors," the Legislature effectively precluded courts from issuing any joint and several verdicts, which by their definition, do not apportion fault or damages. See Eidson, 24 S.E.2d at 897-98.

Furthermore, by removing the possibility of a joint and several verdict the Legislature — in addition to expressly

eliminating any right of contribution against apportioned damages in § 51-12-33(b) — eliminated any need of contribution between tortfeasors. Contribution actions between tortfeasors only exist because of joint and several liability. McReynolds v. Krebs, 725 S.E.2d 584, 587 (Ga. 2012) (citing Weller v. Brown, 464 S.E.2d 805, 806 (Ga. 1996)("[C]ontribution will not lie in the absence of joint or joint and several liability.")). If the trier of fact must apportion fault and damages at the same time it determines liability, even fault and damages of those not present in the litigation, tortfeasors no longer have a need to seek contribution. The trier of fact has already allocated to them "their share" of the judgment therefore they cannot bring an action claiming they paid more than "their share." Thus, § 51-12-33 effectively eliminated not only joint and several verdicts for multiple tortfeasors but also contribution actions among multiple tortfeasors. District Owners Ass'n, Inc. v. AMEC Envtl. & Infrastructure, Inc., 747 S.E.2d 10, 14 (Ga. Ct. App. 2013) ("[O]ur Supreme Court has held that OCGA § 51-12-33 supplanted claims for common law contribution and apportionment.").

Nevertheless, despite the intentions of the drafters, and the plain language of the statute, scholars and litigants have questioned whether § 51-12-33 really did eliminate all joint and several liability in Georgia. See Eaton, supra, at 26; Boness, supra, at 224-27; Appellee Supp. Brief, GFI Mgt. Servs., Inc. v.

Medina, 733 S.E.2d 329 (Ga. 2012), 2012 WL 3236340, at *2 (July 26, 2012); Appellant Brief, GFI Mgt. Servs., Inc., 733 S.E.2d 329, 2012 WL 1620940, at *7-*8 (Apr. 26, 2012). Specifically, scholars and litigants have questioned how § 51-12-33 could have eliminated joint and several liability in light of the two preceding sections of the Code, § 51-12-31 and § 51-12-32. See id. Section 51-12-31 states:

> Except as provided in Code Section 51-12-33, where an action is brought jointly against several persons, the plaintiff may recover damages for an injury caused by any of the defendants against only the defendant or defendants liable for the injury. In its verdict, the jury may specify the particular damages to be recovered of each defendant. Judgment in such a case must be entered severally.

Section 51-12-32 states:

> (a) Except as provided in Code Section 51-12-33, where a tortious act does not involve moral turpitude, contribution among several trespassers may be enforced just as if an action had been brought against them jointly. Without the necessity of being charged by action or judgment, the right of a joint trespasser to contribution from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement of a claim or claims for injury to person or property or for wrongful death and release therefrom.
>
> (b) If judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution.

In other words, § 51-12-31 explicitly contemplates joint and several liability even in light of § 51-12-33's apportionment scheme, and § 51-12-32 explicitly contemplates contribution actions even in light of § 51-12-33's prohibition on contribution actions.

14

The confusion, however, does not end at the plain language of §§ 51-12-31 and 51-12-32. To start, § 51-12-31 was revised in the same S.B. 3 as § 51-12-33. The legislature therefore must have had some purpose behind keeping it in the Code. Second, and more important to this Court, the statutes give very little instruction about when courts must apportion damages under § 51-12-33 versus when they need not apportion damages under § 51-12-31. The mandatory apportionment scheme set out in § 51-12-33 starts with the broad proposition that the scheme must be applied "where an action is brought against more than one person for injury to person or property . . . ." Sections 51-12-31 and 51-12-32, meanwhile, state only that they apply "Except as provided in Code Section 51-12-33." The recognition of § 51-12-33 by §§ 51-12-31 and 51-12-32 implies that they should apply at some point, but the broad language of § 51-12-33 — language which arguably encompasses all cases — seems to preclude §§ 51-12-31 and 51-12-32 from ever applying. Finally, the Georgia Supreme Court has offered little guidance on how to resolve this statutory inconsistency. See McReynolds, 725 S.E.2d 584 (declining to decide whether § 51-12-33 eliminated all joint and several liability and deciding instead only that it definitely eliminated joint and several liability in cases where plaintiff was not at fault); Couch v. Red Roof Inns, Inc., 729 S.E.2d 378 (Ga. 2012)(holding that § 51-12-33 required triers of fact to consider the conduct of intentional

tortfeasors when apportioning fault and overturning the prior rule that intentional conduct prohibited a defendant from making use of comparative negligence); GFI Mgmt. Servs., Inc. v. Medina, 733 S.E.2d 329 (Ga. 2012)(declining to answer appellee's question of when a jury must apportion damages under § 51-12-33 versus when a jury may apportion damages under § 51-12-31 and instead opining only that "OCGA § 51-12-33 does not conflict with OCGA § 51-12-31, a statute which expressly does not apply where OCGA § 51-12-33 applies"). Indeed, the only sure fact this Court can glean from the opinions of the Georgia Supreme Court is that "OCGA § 51-12-31 does not conflict with OCGA § 51-12-33." See Medina, 733 S.E.2d at 329.

This Court, however, cannot simply ignore the problems created by this statutory quagmire because whether § 51-12-33 applies matters greatly to the resolution of this case. If the Court determines that damages should have been apportioned among RRS, Nuvell, Renovo, and Brown at trial according to § 51-12-33, then it must hold that Defendants have lost their opportunity to challenge the joint and several verdict entered by the trial court. If, on the other hand, the Court determines that the damages did not have to be apportioned at trial according to § 51-12-33, but could instead be entered jointly and severally according to § 51-12-31, then Defendants' request for contribution could have some validity in light of § 51-12-32(b). Upon consideration, the Court conlcudes that § 51-12-33 should

have applied to the underlying litigation and Defendants cannot seek an action for contribution under § 51-12-32(b).

The Court's reasoning stems from the statutory scheme of § 51-12-33. First, § 51-12-33 explicitly contemplates removing the right of contribution in actions with multiple tortfeasors. The language of sub-section (b) states that "[w]here an action is brought against more than one person . . . the trier of fact . . . <u>shall</u> . . . apportion its award of damages . . . . Damages apportioned by the trier of fact as provided in this Code section <u>shall</u> be the liability of each person against whom they are awarded, <u>shall not</u> be a joint liability among the persons liable, and <u>shall not</u> be subject to any right of contribution." O.C.G.A. § 51-12-33(b) (emphasis added). This language crystalizes the Legislature's intent to eliminate contribution actions among multiple tortfeasors and replace such actions with a mandatory apportionment method that would occur concurrently with a finding of liability. See <u>RadioShack Corp. v. Cascade Crossing II, LLC</u>, 653 S.E.2d 680, 683 (Ga. 2007) ("The cardinal rule in construing a legislative act, is to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the legislative intent and purpose." (internal citations and quotations omitted)). Second, § 51-12-33 applies to all cases with multiple tortfeasors. The plain language of § 51-12-33 ("Where an action is brought against <u>more than one person</u> . . . the

17

trier of fact . . . shall apportion . . . .") captures all cases with multiple tortfeasors, and nothing in § 51-12-33 indicates when it would not apply. See Deal v. Coleman, 751 S.E.2d 337, 341 (Ga. 2013) ("[W]e must afford the statutory text its 'plain and ordinary meaning,' we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would."). Third, § 51-12-33 allows litigants to introduce the fault of others, even others not party to the case, for purposes of deflecting fault. This procedure assures that fault and liability are assigned simultaneously, and in doing so, it further removes any need for a subsequent contribution action against either a party or a non-party to the case. Thus, § 51-12-33 explicitly eliminated a right to contribution, eliminated any need for a right to contribution, and gave no obvious time in which it would allow a claim for contribution once liability and damages were apportioned by a trier of fact.

This statutory scheme, moreover, is not disrupted by § 51-12-31 or § 51-12-32. While both statutes contemplate the continued existence of joint and several liability, the plain text of both sections state that they only apply when § 51-12-33 does not apply. McReynolds, 725 S.E.2d at 588 (holding that § 51-12-32 "cannot trump the rules set forth in OCGA § 51-12-33 because it begins with the phrase, 'except as provided in Code

18

Section 51-12-33'"). The only clear case of when § 51-12-33 does <u>not</u> apply is when a tortfeaser settles and seeks contribution under section 51-12-32(a) — "the right of a joint trespasser to contribution . . . shall continue unabated and shall not be lost or prejudiced by . . . settlement of a claim or claims . . . ." <u>Zurich Am. Ins. Co. v. Heard</u>, 740 S.E.2d 429, 432 (Ga. Ct. App. 2013) ("Based upon the plain language of the statute, it cannot be interpreted to abolish the right of contribution between settling joint tortfeasors when there has been no apportionment of damages by a trier of fact."). Beyond this situation, however, if § 51-12-33 applies "whenever an action is brought against one or more persons," the Court is at a loss to explain why it would ever <u>not</u> apply. <u>Deal</u>, 751 S.E.2d at 740 ("When we consider the meaning of a statute, 'we presume that the General Assembly meant what it said and said what it meant.'" (internal citations omitted)). Furthermore, all the Georgia Supreme Court cases analyzing this interpretive quagmire have essentially said, "When in doubt, § 51-12-33 applies." Thus, because Defendants have provided no reason why § 51-12-33 would not apply to this case, and because the Court cannot find one independently, the Court holds that § 51-12-33 does apply — or should have applied — to this case.

Having determined that § 51-12-33 should have applied, what about the fact that the trial court nevertheless failed to apportion liability and instead issued a joint and several

verdict? Would that joint and several verdict not trigger the right of contribution under § 51-12-32(b)? The answer is, and must be, no.

Defendants may not now claim a right of contribution on behalf of their insured under § 51-12-32(b) because doing so would defeat the entire statutory regime of § 51-12-33. If this Court were to grant a contribution action, it would effectively render § 51-12-33 meaningless. The command that the trier of fact "shall" apportion liability and damages loses all meaning if Defendants may ignore the apportionment at trial and simply petition for apportionment in a separate, subsequent action. Essentially, § 51-12-33 transfers the right of contribution from a subsequent action separate from the finding of liability to a concurrent action simultaneous with the finding of liability. Consequently, it also transfers the time at which defendants may exercise and defend that right. Allowing a collateral attack on the apportionment of damages after trial would do serious damage to both the General Assembly's statutory scheme and judicial efficiency. Thus, if Defendants desired to apportion fault between their insured and the other tortfeasors, they needed to defend this right at trial and on direct appeal.

Defendants argue, however, that they could not challenge the joint and several verdict because they were not a party to the case and lacked standing. This is disingenuous. Defendants could not challenge the trial court's decision because they

willfully chose not to defend their insured. They only seek a contribution action now because they were, unexpectedly and belatedly, forced to make good on their insurance promises by a state appellate court subsequent to the trial court's entry of judgment. See Nuvell Nat. Auto Finance, LLC v. Monroe Guar. Ins. Co., 736 S.E.2d 463 (Ga. Ct. App. 2012). Had Defendants defended and reserved their rights, they could have petitioned the trial court or appellate court to follow the apportionment statute.

But, even if Georgia law did allow Defendants to bring a contribution action between the tortfeasors in this litigation, the plain language of § 51-12-32(b) does not allow Defendants to change this action from solely a contribution action between co-insurers to both a contribution action between co-insurers and a contribution action between multiple tortfeasors. The statute clearly states that contribution is only available to a tortfeasor who pays off the judgment. O.C.G.A. § 51-12-32(b) ("If judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution." (emphasis added)). Thus, in order to file an action for contribution, the person bringing the action must have paid off at least some portion of the judgment. See Snyder v. Elkan, 199 S.E. 891, 895 (Ga. 1938) ("Before one is entitled to contribution as an affirmative remedy, he must show not only a common liability, but payment by him of more than his

share."); <u>Eidson</u>, 24 S.E.2d at 897 ("Before the right of contribution arises, one must have paid more than his share of a common burden which all were equally bound to bear. . . ."). Defendants, however, have paid no portion of the judgment. Plaintiffs are the only parties to have paid any portion of the judgment, thus Plaintiffs are the only ones who have, potentially, paid more than their fair share. Therefore, the right to sue for contribution between tortfeasors, even if it were to exist at this stage, belongs only to Plaintiffs, as subrogees, standing in the shoes of their insured. 2 Allen D. Windt, <u>Insurance Claims and Disputes</u>, § 10.5 (6th ed. 2017) ("Under either doctrine of subrogation . . . the [insurance] company is ordinarily entitled . . . to step into the shoes of the insured and assert any cause of action against a third party that the insured could have asserted for his or her own benefit had the insured not been compensated by the insurer."). It does not belong to Defendants.

Here, Plaintiffs have not sought a contribution action between RRS, Nuvell, Renovo, and Brown. They have sought to apportion coverage expenses between themselves and Defendants. Defendants cannot force Plaintiffs to seek relief that Plaintiffs had no obligation, or desire, to seek. Nor can Defendants assert such an action themselves.

In addition to the fact that they have no right to bring such an action, they have not in fact brought such an action.

Defendants have not subrogated themselves into the shoes of their insured or joined to this litigation all the tortfeasors against whom they would seek an apportionment of damages. They have not even filed a cross-claim against Plaintiffs claiming contribution. Thus, they are precluded from attempting to claim contribution in the present action.

The truth of the matter is that Defendants have only themselves to blame. They have fought tooth and nail to avoid paying any portion of the judgment, and, in doing so, they have missed their opportunities to lessen their coverage expenses. Had Defendants taken part in their insureds' defense, they could have had the opportunity to apportion damages among the tortfeasors at the state trial level. Defendants are only complaining now because a state appellate court found that they did, in fact, owe coverage to their insured. The public policy of Georgia is that insurers should defend their insured first and fight over coverage later. Cont'l Ins. Co. v. Fed. Ins. Co., 266 S.E.2d 351, 352 (Ga. Ct. App. 1980) ("We believe it is sound public policy to encourage insurance companies to make a swift settlement of claims. It would also be against public policy to force an insured, who has coverage under more than one policy, to institute legal action to collect payment for the loss in a case where a dispute arises between insurance carriers over their respective liabilities under the policies.") This policy aims to prevent instances exactly such as this, where the

insurer who takes the least amount of action is rewarded. Id. Therefore, having made their bed, Defendants must lie in it.

**2.**

In contrast to a contribution claim between multiple tortfeasors, however, Georgia law clearly allows a contribution action between co-insurers. "Under Georgia law, an insurer has standing to pursue claims for contribution and subrogation against a co-insurer that has refused to pay its share of a loss that both insurers owe." Arrow Exterminators, 136 F. Supp. 2d at 1352 (citing Aetna Cas. & Sur. Co. v. Empire Fire & Marine Ins. Co., 442 S.E.2d 778 (Ga. Ct. App. 1994); Cont'l Ins. Co., 266 S.E.2d 351). "[I]f two insurance companies are obligated to pay a loss and one company pays the entire loss or more than its pro rata share of the loss, the one so paying has a right of action against the co-insurer for a ratable proportion of the paid amount." Id. The only condition is "that the insured [must have] had a right of recovery under the nonpaying insurer's policy." Id. Plaintiffs are co-insurers with Defendants and Defendants have refused to pay for any loss, despite a finding by the state court of appeals that they owe coverage to their insured. Thus, this Court may apportion liability between Plaintiffs and Defendants as co-insurers sharing a common liability.

**3.**

At this point, the Court must acknowledge two discrepancies in its previous ruling. First, in its previous decision, the Court applied Michigan law to characterize the present action as one for subrogation. It should have applied Georgia law. The Georgia choice-of-law rules require courts to use the law of the forum state when deciding questions of procedure or remedy. Allstate, 462 S.E.2d at 640. Actions of contribution and subrogation are questions of remedy and procedure. Gerschick v. Pounds, 586 S.E.2d 22, 25 (Ga. Ct. App. 2003) (overruled on other grounds) ("[T]he right of contribution is a legal remedy.") Thus, this Court should have used Georgia law to determine the precise nature of the present action.

Second, the Court's choice-of-law mistake led it to incorrectly characterize the action as one for subrogation only. Under Michigan law, this action would be characterized as one for subrogation. See Allstate Ins. Co. v. Citizens Ins. Co. of Am., 325 N.W.2d 505, 509 (Mich. Ct. App. 1982). Under Georgia law, however, the action should have been defined as one for contribution, not subrogation.

The key to distinguishing between subrogation and contribution is understanding the substance of what each action involves. Subrogation involves asserting the rights of one party against a third party by proxy. William J. Schermer and Irvin E. Schermer, 4 Auto. Liability Ins., § 64:2 (4th ed. 2016)("The right of subrogation is purely derivate . . . . Thus

an insurer cannot acquire by subrogation anything to which the insured has no rights." (quoting Fireman's Fund Ins. Co. v. Maryland Cas. Co., 65 Cal. App. 4th 1279, 1292-93 (1st Dist. 1998)). Contribution, on the other hand, involves asserting rights personal to oneself against another party directly. See Allan D. Windt, supra, § 10.5 ("Contribution is a remedy given to one who pays a debt that is concurrently owed by another."). Plaintiffs cannot make a subrogation claim because they cannot assert the rights of their insured against Defendants. Plaintiffs cannot assert the rights of their insured because their insured have no rights to assert. Plaintiffs have satisfied the claim of their insured, and their insured have no legitimate rights to reimbursement from any other insurer. Plaintiffs, however, can assert a right to contribution. Plaintiffs are suing Defendants for the purpose of forcing Defendants to reimburse them for satisfying a debt that was concurrently owed. See id. (noting that when the liability of two insurers is "co-extensive," "[t]he paying insurer's remedy . . . would be one for contribution, not indemnity or subrogation."). That is, both Plaintiffs and Defendants were equally bound to cover their co-insureds' losses, thus they shared a "co-extensive" liability. See id. Therefore, the Court believes that the better characterization of this action is one for contribution between two insurers who had mutual coverage obligations.

## B.

Having characterized the action as a dispute between insurers over the percentage they must pay of a common liability, the Court now resolves that dispute. First, the Court determines which state's law is applicable to this issue. Second, the Court discusses how the applicable state law apportions the common obligations.

## 1.

In its previous ruling, the Court determined that Michigan law applied to interpret the contracts between the various insurers and their insured. This determination was supported by Plaintiffs and Defendants as well as the state appellate and trial courts in this case. In the process of reviewing the instant motions for summary judgment, however, the Court's research revealed a caveat to Georgia's choice-of-law rules that cast doubt on its previous decision to use Michigan law. At the Court's request, the parties' provided supplemental briefing on the Court's concerns. The Court now concludes that it erred in applying Michigan law.

Because this is a diversity case, the Court must apply the substantive law of the forum state: Georgia. Nova Cas. Co. v. OneBeacon Am. Ins. Co., 603 F. Appx. 898, 900 (11th Cir. 2015). A state's substantive law includes its conflict-of-law rules. Id. Thus, the Court applies Georgia law to determine what state law should govern the issues in dispute. Id.

Under Georgia law, the choice of law depends upon the type of action being litigated. Fed. Ins. Co. v. Nat'l Distrib. Co., Inc., 417 S.E.2d 671, 673 (Ga. Ct. App. 1992). For questions pertaining to tort actions, Georgia courts follow the rule of lex loci delicti. Id. For questions pertaining to remedy and procedure, Georgia courts follow lex loci fori. Id. And for questions pertaining to contracts, Georgia courts follow the rule of lex loci contractus. Id.

The present action is one of contract. Both Plaintiffs and Defendants contracted, either directly or indirectly, with RRS and Nuvell. These contracts established that, in exchange for periodic payments, Plaintiffs and Defendants would pay for losses (liabilities) incurred by RRS and Nuvell under certain conditions. This case arises out of the parties' disagreement about who must pay first under the terms of the competing contracts. To settle this dispute, the Court must examine the language of the policies issued to determine in which order and to what degree the four insurers must pay for the losses incurred by their joint insureds. 3060 Corp. v. Crescent One Buckhead Plaza, L.P., 686 S.E.2d 367, 370 (Ga. Ct. App. 2009). Thus, the lex loci contractus rule applies to this case.

Under lex loci contractus "the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be

performed in another state, the substantive law of the state where the contract is performed will apply." <u>Fed. Ins. Co.</u>, 417 S.E.2d at 673. Georgia law has recognized, however, that most insurance contracts, by their nature, "have no particular place where performance is contemplated." <u>Id.</u> at 674. Thus, Georgia employs the simple rule that insurance contracts are governed by the law of the place where the contract was finally delivered. <u>Lima Delta Co. v. Global RI-022 Aerospace, Inc.</u>, 789 S.E.2d 230, 235 (Ga. Ct. App. 2016).

Given this rule, it appears that Michigan law should apply to this contract dispute. Of the four contracts at issue, three of them were delivered and finalized in Michigan. The one that was not, the Interstate policy excess policy issued to Renovo, was a "follow form" excess insurance contract connected to the U.S. Fire primary policy. (Doc. 70-4 at 35 ("The definitions, terms, conditions, limitations, exclusions and warranties contained in the 'underlying insurance' policies that are in effect at the inception date of this policy apply to this policy unless they are inconsistent with provisions of this policy . . . .").) "A 'following form' excess policy incorporates by reference the terms and conditions of an underlying primary insurance policy as if those terms and conditions were its own." <u>Ins. Co. of Penn. v. APAC-Southeast, Inc.</u>, 677 S.E.2d 734, 737 n.2 (Ga. Ct. App. 2009). It follows that the contract's interpretation must be governed by the state law which governs the primary policy.

Lee v. Interstate Fire & Cas. Co., 86 F.3d 101, 103 (7th Cir. 1996) ("Two policies with identical language covering the same risk should have identical effects.   Lloyd's issued the basic policy; Interstate sold a "follow form" excess policy with identical substantive terms.   It would be absurd if the primary policy were governed by United Kingdom Law, and the excess policy by Illinois law, just because that is the location of the insurers (and therefore the last acts necessary to make the insurance effective).").   Thus, because three of the contracts were actually delivered in Michigan, and one was constructively delivered in Michigan, Michigan law applies.

Not quite.   Georgia's seemingly straightforward rule is subject to an old and difficult to find exception.   "[T]he application of another jurisdiction's law is limited to statutes and decisions construing those statutes." Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F.2d 1500, 1503 (11th Cir. 1983).   If no foreign statute or case law construing a foreign statute governs the issue in dispute, the Georgia courts will apply Georgia common law "rather than foreign case law." Id.   This caveat has been recognized multiple times.   See Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 n.6 (11th Cir. 1987) (citing with approval Frank Briscoe: "If a particular state does not have a controlling statute, however, the Georgia choice of law rule requires application of the common law as construed by the Courts of Georgia."); Budget Rent-A-Car Corp. of Am. v.

Fein, 342 F.2d 509, 513 (5th Cir. 1965) (noting that "where there is no applicable foreign statute" Georgia courts presume the common law applies and apply the common law "as illumined by Georgia decisions"); Briggs & Stratton Corp. v. Royal Globe Ins., 64 F. Supp. 2d 1340, 1343-44 (M.D. Ga. 1999) (following Frank Briscoe Co.); Calhoun v. Cullum's Lumber Mill, Inc., 545 S.E.2d 41, 44-46 (Ga. Ct. App. 2001) (applying Georgia common law after determining that no South Carolina statute was applicable to resolution of a contract dispute); John B. Rees, Jr., Choice of Law in Georgia: Time to Consider a Change?, 34 Mercer L. Rev. 787, 789 (1983) (recognizing that "Georgia's choice of law system is unusual in that the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes").

With this exception in mind, the question for the Court now becomes: Is there any Michigan statute governing the interpretation of contracts or the priority and allocation of expenses between two co-insurers? The Court asked this question in its request for supplemental briefs. Defendants provided two potential statutes. Plaintiffs provided none.

First, Defendants cited a Michigan statute that provides, in part:

> A liability insurer, who by payment has discharged in full or in part the liability of a tort-feasor and has thereby discharged in full its obligation as insurer, is subrogated to the tort-feasor's right of contribution to the extent of the amount it has paid in excess of the

tort-feasor's pro rata share of the common liability. It may assert this right either in its own name or in the name of its insured.

M.C.L.A 600.2925a(6). Defendants argue that, if contribution actions are considered contractual actions, this statute silences the exception to lex loci contractus because it is a state law which governs the contribution action. Defendants, however, made clear that they "do not contend that the right to contribution among insurers is a contractual right, but rather an equitable right," and that this argument was merely an alternative argument. The Court agrees with Defendants.

A contribution action is not a contractual action. Pilzer v. Virginia Ins. Reciprocal, 611 S.E.2d 706, 707 (Ga. Ct. App. 2005) ("The doctrine [of contribution] is not founded upon contract, but upon principles of equity, and assists in the fair and just division of losses, preventing unfairness and injustice."). A contribution action is simply a procedural device used to affect a certain remedy: the equitable distribution of a common burden. Joice v. Scales, 18 Ga. 725, 725-26 (1855) ("We may safely assume, as a general principle, that the lex loci rule applies only to the interpretation of contracts to their construction, and that the remedy on them must be prosecuted according to the laws of the country in which the action is brought."). The only reason this contribution action involves a contract is because the equitable distribution

of a common burden requires examining the obligations to which the litigants contractually bound themselves. The contribution action is merely the vehicle by which the litigants must travel to arrive at their substantive dispute. See Allstate Ins. Co. v. Duncan, 462 S.E.2d 638 (Ga. Ct. App. 1995) (holding that whether a party must sue John Doe before he could sue his own uninsured motorist carrier "is a procedural and remedial matter, and thus governed by Georgia law").

This conclusion is further buoyed by the structure of the Michigan statute. The subsection cited by Defendants falls under a section titled "Contribution between tort-feasors." M.C.L.A. 600.2925a. Thus, it is clear that even if this contribution action were to be called something other than a remedy, it would relate to tort, not contract. A contribution action between tortfeasors relies on the law of tort to distribute fault between tortfeasors. Nothing in the insurers' contracts has any bearing on the differing degrees of tortfeasor negligence. Thus, it would still be governed under Georgia law. And, as this Court has already discussed at length, Georgia's apportionment scheme does not allow the insurers in this case to seek contribution between the tortfeasors at this stage in the litigation.

Second, Defendants cite a portion of the Michigan No-Fault Insurance Act ("MNFIA"). "The MNFIA regulates automobile insurance policies purchased by persons with cars registered in

Michigan. It requires all car owners to maintain a no-fault insurance policy, which must include 'personal protection insurance' coverage." Shields v. Gov't Emps. Hosp. Ass'n, Inc., 450 F.3d 643, 646 (6th Cir. 2006). The no-fault nature of the required insurance allows insureds to "recover directly from their insurers, without regard to fault, for qualifying economic losses arising from motor vehicle incidents." McCormick v. Carrier, 795 N.W.2d 517, 523 (Mich. 2010). The portion cited by Defendants, M.C.L.A. 500.3115(1), details the priority of allocation among multiple insurers to an accident:

> (1) Except as provided in subsection (1) of section 3114, a person suffering accidental bodily injury while not an occupant of a motor vehicle shall claim personal protection insurance benefits from insurers in the following order of priority:
>
> (a) Insurers of owners or registrants of motor vehicles involved in the accident.
>
> (b) Insurers of operators of motor vehicles involved in the accident.

Defendants claim that 500.3115 establishes priority of allocation between the co-insurers of this dispute. It does not. 500.3115, and the entire MNFIA, is inapplicable to the present situation.

Defendants' argument fails because it takes one section of the MNFIA and isolates it from the rest of the statute. The MNFIA is a comprehensive statute meant to ensure that drivers on Michigan highways have adequate insurance to cover damages. It requires "[t]he owner or registrant of a motor vehicle required

to be registered in [Michigan]" to purchase "personal protection insurance, property protection insurance, and residual liability insurance . . . during the period of registration of the motor vehicle." M.C.L. § 500.3101(1) (emphasis added). "According to the express language of the statute only those vehicles required to be registered in [Michigan] are subject to the requirements of the no-fault act." Covington v. Interstate Sys., 277 N.W.2d 4, 5 (Mich. Ct. App. 1979) (holding that the driver of a truck owned by a Michigan corporation, but neither registered nor required to be registered in Michigan, could not recover under the MNFIA). Thus, the MNFIA applies only to vehicles required to be registered in the state of Michigan. Because the vehicle in dispute was not required to be registered in Michigan, the Court will not apply the priority of coverage provision to the present dispute.

Furthermore, because the statute dictates a comprehensive scheme to regulate insurance in Michigan, the Court hesitates to apply such a regulatory scheme outside the state of Michigan. Georgia has its own rules and regulations pertaining to the insurance requirements necessary to drive on its highways. It also has its own rules and regulations concerning uninsured motorists. The Court will not foist upon it the rules and regulations of Michigan simply because a contract was delivered in Michigan. To do so would be to apply not the contract law of Michigan but the regulatory law of Michigan. The purpose of lex

35

loci contractus is to honor the intent of the contracting parties, not to substitute the regulatory scheme of one state for another. Thus, the Court concludes that the statutory provision volunteered by Defendants is not applicable to the interpretation of the contracts at issue and does not decide the issue of priority and allocation.

Because no Michigan statute governs the priority and allocation of the common liability between the co-insurers and because no Michigan statute governs the interpretation of contracts, the Court concludes that the exception to lex loci contractus applies. Thus, Georgia, not Michigan law, applies to interpret the contracts in dispute.

**2.**

"Under Georgia law, '[a]n insurance contract is governed by the ordinary rules of statutory construction and should be construed to ascertain the intentions of the parties.'" The Am. Cas. Co. of Reading v. MAG Mut. Ins. Co., 185 F. Appx. 921, 925 (11th Cir. 2009) (quoting Progressive Preferred Ins. Co. v. Brown, 413 S.E.2d 430, 431 (Ga. Ct. App. 1992)). "[T]he interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the courts to decide." Giddens v. Equitable Life Assur. Soc. of U.S., 445 F.3d 1286, 1297 (11th Cir. 2006). Before the Court can highlight the pertinent language of the four contracts

at issue, however, it notes some basic insurance principles that will impact how the Court interprets the various contracts.

First, insurance contracts often fall into two categories: Primary and Excess. Primary insurance covers an initial level of liability. Excess insurance (also known as umbrella insurance) covers losses that exceed an initial level of liability. Usually, this initial level of liability is the limits of a specifically named primary insurance policy. Second, insurance contracts often anticipate the existence of another insurer by including "other insurance" provisions. These "other insurance" clauses come in three forms: "excess" clauses, "pro rata" clauses, and "escape" clauses.

"Excess" clauses allow a primary policy "to avoid double payment when the insured has other insurance." St. Paul Fire & Marine Ins. Co. v. Valley Forge Ins. Co., No. 1:06-CV-2074-JOF, 2009 WL 789612, at *4 (N.D. Ga. Mar. 23, 2009). They do not make the policy an excess policy, but merely "provide[] that an insurer will pay a loss only after other available primary insurance is exhausted." Am. Cas. Co., 185 F. Appx. at 925 n.2 (internal citations omitted). "Pro rata" clauses, on the other hand, merely allow insurers to lessen their liabilities when the insured has other insurance. "A pro rata clause 'provides that the insurer will pay its share of the loss in the proportion its policy limits relates to the aggregate liability coverage available.'" Id. (internal citations omitted). Finally,

37

"escape" clauses allow insurers to escape liability altogether. Id. They "provide[] that an insurer is absolved of all liability where other coverage is available." Id. (internal citations omitted).

The Court now turns to the language of the contracts themselves. The Court's initial task is to settle a dispute between the parties about to which tortfeasors they provided overlapping insurance. Defendants claim the parties provided overlapping insurance to RRS and Nuvell. Plaintiffs claim the parties provided overlapping insurance only to RRS, and they deny owing coverage to Nuvell. The Court agrees with Defendants.

The language of the U.S. Fire policy clearly establishes that it covers Nuvell. The U.S. Fire policy states that RRS is a named insured. (Doc. 70-1 at 3.) It then states that the "[Business Auto Coverage Form's] Liability Coverage is primary for any liability assumed under an insured contract." (Id. at 19.) The policy defines an "insured contract" as "that part of any other contract or agreement pertaining to your business . . . under which you assumed the tort liability of another to pay for bodily injury or property damage to a third party or organization." (Id. at 21.) In 2006, RRS agreed to

> indemnify and hold harmless [Nuvell] . . . from any and
> all liabilities, losses, damages, costs, and expenses
> (including reasonable attorneys' fees and legal expenses),
> suits, and/or causes of action . . . arising out of
> [RRS's] negligent, reckless, or willful misconduct in the

38

performance of any Services under this Agreement, and any Services performed by any entity, person or company to which Contractor assigns Services whether with or without knowledge of [Nuvell], and from [RRS's] breach of any covenant, representation or warranty set forth in this agreement or in [Nuvell's] Policy on Repossession and Location Information.

_Nuvell_, 736 S.E.2d at 470. The state trial court held that "Nuvell was entitled to contractual indemnification by [RRS] for all claims against it" based upon this indemnification agreement. _Id._ Thus, the agreement between RRS and Nuvell is an "insured contract" and U.S. Fire owes primary coverage to Nuvell.

The Court's next task is to determine whether the U.S. Fire, Monroe, Interstate, and FCCI policies, when viewed in light of each other, provide primary or excess coverage for RRS and Nuvell. First, the Court finds U.S. Fire and Monroe both provided primary coverage to RRS. At first glance, this runs counter to the policy language because RRS did not own the "covered auto" that triggered coverage, and the Business Auto Forms of both policies state that "[f]or any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance." (Docs. 70-1 at 19; 70-2 at 15.) But because there is no "other collectible insurance," the policies have nothing to be "excess over" and are thus primary policies. Next, the Court concludes that U.S. Fire and Monroe also provided primary coverage to Nuvell. Both policies covered RRS, and RRS agreed to indemnify Nuvell. Both

policies also contained the identical language that "Liability Coverage is primary for any liability assumed under an insured contract." (Id.) Thus, they both provided primary insurance to Nuvell. Finally, the Court finds that the Interstate and FCCI policies provide excess coverage to RRS and Nuvell.

In sum, Plaintiff U.S. Fire and Defendant Monroe are primary insurers for RRS and Nuvell. Plaintiff Interstate and Defendant FCCI are excess insurers for RRS and Nuvell. Interstate was the excess insurer for U.S. Fire. FCCI was the excess insurer for Monroe. This determination leaves the Court with one final question: Who has the responsibility to pay and in what amount?

Because all parties concede that the Interstate and FCCI policies are "true excess" policies, and thus will not apply until after the primary policies are exhausted, the Court begins by examining the language of the two primary policies – the U.S. Fire policy and the Monroe policy. The U.S. Fire and Monroe policies, respectively, contain nearly identical "other insurance" clauses:

> When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

(doc. 70-1 at 19) and

> When this Coverage Form and any other Coverage Form or policy covers on the same basis, whether excess or

primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

(doc. 70-2 at 15). These "other insurance" clauses are "pro rata" clauses, and by their very terms explain how the insurers should allocate their common liability. Both policies "cover on the same basis," thus each policy must pay "the proportion that its limit of insurance . . . bears to the total of the limits of all the coverage forms and policies covering on the same basis."

In order to calculate the insurers' respective obligations, however, the Court must first determine the exact amount of damages that must be split between them. Plaintiffs contend that the parties must allocate the total damages incurred by the tortfeasors in the underlying case: $2,528,794.12. Defendants counter that they are only fighting over half that amount. Defendants are correct. The verdict was issued jointly and severally; thus, all tortfeasors were equally on the hook for satisfying the judgment. This means that each tortfeaser owed 25% of the judgment, or $632,198.53. Because Defendants only insured two of the tortfeasors, Defendants must cover, at most, only 50% of the judgment. Therefore, the total amount of damages that must be allocated between Plaintiffs and Defendants is $1,264,397.06, not $2,528,794.12.

Both policies had limits of $1 million. Because their limits are equal, the "share" due by each primary insurer is

50%. 50% of $1,264,397.06 is $632,198.53, which is less than each insurer's $1 million policy limits. Thus, the primary insurance policies will not be exhausted by coverage as applied to RRS and Nuvell, and the excess insurance policies will not be triggered. And because the excess insurance policies will not be triggered, there are no allocation issues between the excess insurers that this Court must discuss.

### IV. CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** both parties' motions for summary judgment. (Docs. 70 & 76.) It **DENIES** Defendants' request to apportion damages between RRS, Nuvell, Renovo, and Brown. It also **DENIES** Plaintiffs' request to apportion the entire $2.5 million verdict among all four insurers to this dispute. The Court concludes that the joint and several verdict cannot be challenged via an action for contribution and that the disputed damages in this case total the proportional share of the joint and several verdict owed by RRS and Nuvell: $1,264,397.06. Because Defendant Monroe and Plaintiff U.S. Fire are the primary insurers of RRS and Nuvell, and because they have pro rata "other insurance" clauses which mandate that they each bear half of the burden, the Court finds that U.S. Fire and Monroe have coverage obligations with respect to RRS and Nuvell totaling **$632,198.53** each. Thus, Monroe owes Plaintiffs $632,198.53. The Court **ORDERS** the parties to submit to the Court, within 14 days of this Order, a joint proposed

judgment detailing how Monroe's coverage obligations, including any interest, should be distributed among Plaintiffs.  The Court also instructs the parties to notify the Court of any additional issues outstanding.

**ORDER ENTERED** at Augusta, Georgia, this ___12th___ day of September, 2017.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA